IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF PUERTO RICO

| | |
|---|---|
| CASANDRA ANN HERNANDEZ | CIVIL NO. |
| Plaintiff | |
| v. | Discriminatory retaliation, and removal from Federal Service (5 U.S.C.7703(b)(2) |
| ROBERT M. WILKINSON, Acting Attorney General of the U.S. | |
| | JURY TRIAL DEMANDED |
| Defendant | |

## COMPLAINT

TO THE HONORABLE COURT:

COMES NOW Plaintiff, CASANDRA ANN HERNANDEZ, through the undersigned attorneys and respectfully states, alleges and prays as follows:

### I.    NATURE OF ACTION

1.    This civil action is brought by Casandra Ann Hernandez to seek redress for the discriminatory and retaliatory actions taken against her by the Drug Enforcement Administration (DEA) of the United States Department of Justice (DoJ), in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* and the Civil Rights Act of 1991, as amended, 42 U.S.C. 1981, for relief from retaliation for engaging in EEO protected activity. This civil action is also brought pursuant to the Civil Service Reform Act of 1978 (CSRA), as amended, 5 U.S.C. 1101, *et seq,* 5 U.S.C. 7703(b)(2), *Kloeckner v. Solis*, 133 S. Ct. 596 (2012) and *Perry v. MSPB*, 582 U.S. ____ (2017), seeking reparations for the unlawful and discriminatory removal of Ms. Hernandez from Federal service.

2.    Defendant discriminated against Plaintiff on the basis of retaliation for requesting reasonable accommodations to her disabilities, retaliation for her prior EEO activity, and retaliation for another illegal-conduct-denouncing activity protected as a prohibited personnel practice in the Federal service, 5 U.S.C. 2302(b)(9)(A)(ii).

3.    Ms. Hernandez was subjected to a hostile work environment and suffered numerous adverse actions, culminating in her removal from Federal service effective August 7, 2020. A mixed-case appeal was timely filed with the Merit System Protection Board, *NY-0752-20-0229-I-1*, and an initial decision was issued by AJ Nicole DeCrescenzo which became final on January 27, 2021.

## II.    JURISDICTION and VENUE

4.    Federal Question jurisdiction is invoked pursuant to 28 U.S.C. 1331 and 1343, based on Plaintiff's right as a federal employee to be free from discrimination.

5.    This court has jurisdiction over Ms. Hernandez's claims of discrimination, harassment and retaliation that precede her removal from Federal service under Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e-16, *et seq.*, and the Civil Rights Act of 1991, as amended, 42 U.S.C. 1981.

6.    This court has jurisdiction over Ms. Hernandez's removal from Federal service pursuant to the Civil Service Reform Act of 1978 (CSRA), as amended, 5 U.S.C. 1101, *et seq,* 5 U.S.C. 7703(b)(2), *Kloeckner v. Solis*, 133 S. Ct. 596 (2012) and *Perry v. MSPB*, 582 U.S. ____ (2017).

7.    Plaintiff exhausted all administrative remedies prerequisite to this action.

8.    This judicial complaint is filed within the applicable statute of limitations and within 30 calendar days after the MSPB decision became final.

2

9.    This judicial district is the proper venue to bring this complaint because it is where Ms. Hernandez was employed by the DEA, and where the actions and omissions that give rise to this claim occurred.

### III.    PARTIES and ACTORS

10.    Plaintiff CASANDRA ANN HERNANDEZ is a Puerto Rican female with prior EEO activity who was employed by the Drug Enforcement Administration of the U.S. Department of Justice as Secretary to the Assistant Special Agent in Charge (ASAC), G-0318-08, in the DEA's Ponce District office in Puerto Rico, until her removal from Federal service effective August 7, 2020.

11.    The Drug Enforcement Administration is a federal law enforcement agency under the U.S. Department of Justice tasked with combating drug trafficking and distribution within the United States. The Attorney General of the United States is the head of the employing agency, thus the proper defendant in this action.

12.    At the times relevant to this complaint, the ASAC position at the Ponce DO was first held by Israel Alicea, and then by Dave Joseph.

13.    At the times relevant to this complaint the DEA position of Special Agent in Charge (SAC) for Puerto Rico was first held by Matthew Donahue, and then by Apolonio J. Collazo.

### IV.    FACTS

#### A.  The Setting and the People

14.    Ms. Hernandez is a woman, born and raised in Puerto Rico who displays the physical, cultural and linguistic characteristics of a Puerto Rican. She started working in the DEA in 1999 as Secretary for the High Intensity Drug Trafficking Area (HIDTA)

office in Ponce. In 2010 Ms. Hernandez was assigned to the DEA's Diversion Office in Ponce where she worked as an Investigative Assistant, supporting the agents of the Task Force and performing administrative jobs. Then in January 2016 she began training for the position of Secretary to the ASAC (ASAC-Sec) and was physically transferred to the Ponce District offices located in another building.

15.    As ASAC-Sec, Ms. Hernandez's direct supervisor was the ASAC, a position that was occupied until June 2016 by Israel Alicea. The Special Agent in Charge ("SAC"), Ms. Hernandez's second tier supervisor, was Matthew G. Donahue.

16.    As ASAC-Sec, Ms. Hernandez's duties included serving as IMPREST Fund Cashier responsible for dispensing money to the agents to use in their field operations.

17.    Ms. Hernandez's workstation was in the IMPREST Fund room, which is a separate space within the Ponce DO that has a safe and cameras to monitor the area. These cameras, exclusive to Plaintiff's work area, were monitored by DEA headquarters and by the Ponce DO.

18.    In July 2016 Dave Joseph was assigned to the Ponce DO as ASAC and was permanently stationed in Ponce to oversee all the operations and administrative matters of the office.

19.    For the more than 18 years of tenure with the DEA, Ms. Hernandez had an outstanding record of performance, until the arrival of ASAC Joseph, which derailed her career ending with removal from Federal service effective August 7, 2020.

### B. The hostile work environment under ASAC Joseph

20.    When ASAC Joseph arrived at the Ponce DO, Ms. Hernandez was already working from the IMPREST Fund room, under camera surveillance. However, under

ASAC Joseph she started to feel "watched"; she felt the camera was detecting her text messages.

21.    Ms. Hernandez complained to ASAC Joseph about the camera monitoring and asked to be relocated to another office space.

22.    ASAC Joseph initially approved the move but later recanted claiming he did not want her near Special Agent Jasmine Carter's workstation, with whom Ms. Hernandez had a shouting confrontation on December 8, 2015 that resulted in the filing of an EEO complaint of discrimination (age, disability and reprisals), *DEA-2016-00292*, which was dismissed on June 2, 2016.

23.    The month prior to the denial of relocation, Ms. Hernandez had informed ASAC Joseph of the filing and dismissal of her EEO complaint against SA Carter.

24.    Ms. Hernandez insisted that she felt "watched" by the cameras and was authorized by SAC Donahue and ASAC Joseph to coordinate the installation of wall partitions to get a hold of an office area with privacy. However, it was a worthless endeavor because there was no area in the office that the cameras could not reach.

25.    ASAC Joseph publicly mocked and mistreated Ms. Hernandez.

26.    ASAC Joseph referred to the Puerto Rican DEA agents as the "Puerto Rican mafia", "your people", and asked Ms. Hernandez to convey messages of "bad" performance and threats "to fire" employees.

27.    ASAC Joseph also verbally attacked and unjustifiably criticized ASAC Ivan Lugo and ASAC Israel Alicea, both of whom had been Joseph's direct supervisors.

28.    This conduct made Ms. Hernandez realize that she had to "watch her back" so that ASAC Joseph would not do to her what he was doing to the other ASACs and former supervisors of Joseph.

29.    Ms. Hernandez needed to leave the presence and direct supervision of ASAC Joseph by any reasonable means, thus on October 12, 2016 she requested a downgrade to her previous position of Investigative Assistant at HIDTA.

30.    Ms. Hernandez's memorandum requesting the downgraded transfer referenced "numerous uncomfortable incidences" with ASAC Joseph as the basis for the request. ASAC Joseph reacted offended and demanded that the wording be changed to "many professional confrontational issues" claiming that the way Ms. Hernandez had worded her request "sounded like she was accusing him of sexual harassment".

31.    Ms. Hernandez acquiesced because the objective was to transfer from ASAC Joseph's direct supervision.

32.    Despite the forced editing, Ms. Hernandez's request was denied the next day, October 13, 2016, by SAC Donahue.

33.    In denying Ms. Hernandez's request SAC Donahue indicated that the Diversion Office was going to close, and that Plaintiff's former position was already filled. However, the Diversion office never closed and was still open in August 2020, and Plaintiff's former position was still available as of the date of the transfer request, and for years later.

34.    Ms. Hernandez felt trapped and believed she needed to defend herself from ASAC Joseph thus acted accordingly.

35.     An accident Ms. Hernandez suffered towards the end of September 2016 left her with a fractured foot and required the use of sick leave in excess to what she had available. Consequently, on October 17, 2016 Plaintiff requested Advanced Sick Leave, an action that falls entirely under her supervisor's discretion, and requested accommodation for her temporary disability.

36.     ASAC Joseph's response was to give Ms. Hernandez a Leave Restriction Memorandum (LRM), personally delivering the memo in an October 19, 2016 meeting that Group Supervisor Margarita Rodriguez witnessed at the request of Joseph.

37.     The October 19, 2016 LRM ordered Ms. Hernandez to provide, immediately upon returning to work from sick leave and regardless of the length of the absence, "a physician's certificate as evidence" showing that she was "incapacitated for work due to illness".

38.     The LRM also ordered Ms. Hernandez to report a sick leave absence "before or at the time" of starting work for each day absent, "except in some cases of extended absence", but still had to report weekly regardless of duration of extended absence. Also, Ms. Hernandez had to make the reporting herself, "except in an emergency" or if "incapacitated and unable to make the report".

39.     Ms. Hernandez believed that Management's actions against her were motivated by discriminatory *animus* based on her national origin (Puerto Rican), partial disability and retaliation for her prior EEO activity against SA Carter and contacted the Agency's EEO Counselor.

### C. The EEO Complaint filed on November 22, 2016, DEA-2017-0077

40.    Ms. Hernandez was authorized to file a formal complaint of discrimination, and she filed the formal administrative complaint on November 22, 2016, *DEA-2017-0077*, naming SAC Donahue and ASAC Joseph as the responsible Management.

41.    The Accepted Issues of Ms. Hernandez's complaint were: "[w]hether or not [she] was discriminated against based on her national origin (Hispanic/Puerto Rican), disability (physical), and reprisal (prior EEO activity) when she was subjected to harassment and discriminatory terms and conditions of employment with respect to her office location and conditions,  her duties, being placed on leave restriction and charged six hours absent without leave ("AWOL"), being referred to as a part of the "Puerto Rican Mafia", and being yelled at and humiliated; her request for a downgrade and transfer to her previous position was denied; her request for a reasonable accommodation was denied; and she was subjected to incidents of alleged retaliation of November 28, and December 1, 13 and 15, 2016; January 24 and February 13, 2017".

42.    Therefore, ASAC Joseph and Ms. Hernandez's relationship dramatically deteriorated to a precarious stage. By December 2016 they were barely talking to each other and she would intentionally avoid meeting with him for fear of further retaliatory attacks.

43.    The administrative complaint was investigated and on July 28, 2017 a Final Agency Determination was issued that contained a right to sue.

44.    Ms. Hernandez filed a judicial complaint based on this FAD on November 6, 2017, *Casandra Hernandez v. Jefferson Sessions*, Civil No. 17-2280.

8

### D. The IMPREST Fund Overage and SA Philip Jones

45.     As previously alleged Ms. Hernandez was the Principal Cashier for the IMPREST Fund, and these duties were considered collateral to her ASAC-Sec duties.

46.     As of April 2017 the alternate cashier for the IMPREST Fund was Special Agent Philip Jones, who is also SA Carter's husband.

47.     During the quarterly unannounced IMPREST Fund audit of May 19, 2017 a $100.00 overage was found in SA Jones' alternate cashier drawer. The reason for the overage was found by Ms. Hernandez and it was caused by a returned but improperly logged transaction that SA Jones should not have approved nor accepted. The logs were properly corrected.

48.     Although it was SA Jones who improperly logged the transaction, and it was found in SA Jones's drawer, ASAC Joseph decided that SA Jones' overage was Plaintiff's responsibility and ordered Ms. Hernandez to prepare a memorandum addressed to the Financial Operations Section reporting that the overage was attributed to her as Principal Cashier. Ms. Hernandez refused.

49.     Ultimately, the memorandum that was sent included a narrative of the events and excluded ASAC Joseph's determination of responsibility.

### E. The May 2017 request for reasonable accommodation

50.     On or about May 18, 2017 Ms. Hernandez requested from SAC Donahue reasonable accommodation for a medical finding of brain ischemic white matter changes attributable to persistent stress at her work environment.

51.     Dr. Fabio H. Lugo Gutierrez, Plaintiff's treating psychiatrist, suggested a relocation "to a more suitable workplace to improve her physical and mental condition".

52.    SAC Donahue's response was communicated by his secretary, SAC-Sec Margarita Carrasquillo, on or about June 6, 2017. The SAC-Sec informed Ms. Hernandez that SAC Donahue had reviewed the medical documentation and he had provided Plaintiff two options: transfer to the San Juan office 140 miles and 3 traveling hours away or transfer to the Aguadilla office 134 miles and 3 traveling hours away.

53.    Neither alternative was reasonable for Ms. Hernandez.

54.    Plaintiff believed SAC Donahue's response was a refusal to engage in the requisite interactive process due to her reasonable accommodation request, and retribution for her filing of the November 22, 2016 EEO complaint, *DEA-2017-0077.*

55.    Then Ms. Hernandez learned that on June 18, 2017 the DEA was starting to install laptops to allow for Telework.

56.    Ms. Hernandez believed Telework would be a reasonable accommodation for the medical finding of brain ischemic white matter changes attributable to persistent stress at her work environment and contacted EEO Counselor Kelly Goode seeking her help in procuring the accommodation.

57.    On June 12, 2017 Ms. Hernandez had a telephone conversation with EEO Counselor Goode who informed her of the outcome of the reasonable accommodation request.

58.    During the telephone conversation EEO Counselor Goode asked Ms. Hernandez if she wanted to stay home to bake cakes. This was a reference to Plaintiff's small home-based cake baking business she maintained in her spare time and for which she had authorization by the DEA.

59.    To assuage the EEO Counselor's unwarranted "concerns", which could only have been fueled by SAC Donahue himself, Ms. Hernandez then suggested that she could Telework from the Diversion office.

60.    Ms. Hernandez's request to Telework from the Diversion office was denied because SAC Donahue maintained he was going to "dismantle" the Diversion office.

61.    The Diversion office was never "dismantled" and was still in operations as of August 2020, thus SAC Donahue's stated reasons to refuse accommodation were pretextual.

### F.  The EEO complaint filed against Ms. Hernandez

62.    On June 29, 2017 Ms. Hernandez received an email from Bridgette Gant, mirrBlack Affairs/Affirmative Employment Program Manager of the DEA.

63.    Ms. Gant reached out to Ms. Hernandez to schedule an interview.

64.    During the interview process Ms. Hernandez was informed that a group of Special Agents had filed an informal EEO complaint against her.

65.    The complaining agents were Jasmine Carter, Juan Molina, Michael Fee, Philip Jones, Rushang Patel, Matthew McClenahan and Lauren Garcia.

66.    Ms. Hernandez did not receive a copy of the informal complaint.

67.    Although race was not mentioned as the motivating factor of the informal complaint it seemed to be at least pertinent, considering Ms. Gant's position as the EEO counselor specializing in race discrimination (black).

68.    All complaining agents are Black. ASAC Joseph is also Black.

69.    Ms. Hernandez was asked by Ms. Gant if she was willing to participate in work environment workshops. Plaintiff agreed.

70.    After the interview with Ms. Gant, no documents were sent to Ms. Hernandez and no work environment workshops were held.

### G. The June 2017 complaint with DoJ-OIG

71.    Due to the ongoing circumstances Ms. Hernandez contacted SA Juan Morales of the Department of Justice's Office of Inspector General (DoJ-OIG) and filed a complaint.

72.    Ms. Hernandez complained about ASAC Joseph's intention to change the memoranda on the IMPREST Fund audit to make her responsible for SA Philip Jones' overage.

73.    Additionally, Ms. Hernandez complained about SAC Donahue's refusal to provide reasonable accommodation, by offering the transfer to Aguadilla or San Juan as alternatives and by rejecting the Telework request even from the Diversion office.

74.    Ms. Hernandez denounced that SAC Donahue was unduly influencing EEO Counselor Goode to deny accommodations.

75.    And that ASAC Joseph was using his influence over the agents to have them file an informal EEO complaint against Plaintiff.

76.    Ms. Hernandez believed that she was being singled out from the rest of the employees and that Management was retaliating for her filing of a formal EEO administrative complaint against ASAC Joseph and SAC Donahue. And she feared ASAC Joseph could harm her.

77.    SA Juan Morales' memorialization of the telephonic complaint concluded by indicating that regardless of the plans with the Diversion office, Ms. Hernandez was

"seeking protection or a safe-haven from the Hostile Work environment which is affecting her health permanently".

78.    Despite Ms. Hernandez's complaint, she was not removed from the unhealthy work environment and the effect was the opposite, as Plaintiff's work environment became more hostile.

### H.  The August 28, 2017 request for reasonable accommodation

79.    The hostilities of the work environment negatively affected Ms. Hernandez's physical and mental health and required psychiatric partial hospitalization during the month of August 2017 for the medical diagnosis of Major Depression-recurrent, Generalized Anxiety Disorder and Panic Disorder.

80.    Plaintiff's treating Psychiatrist determined that her workplace was detrimental to her "bio-psycho-social" well-being and recommended urgent relocation to a more suitable workplace.

81.    Therefore, on August 28, 2017 Ms. Hernandez requested to be removed from the Ponce DO as a medical accommodation.

82.    The request was made to ASAC Doby, AO Rosa Torres and the DEA EEO section.

83.    Ms. Hernandez explained that her two physicians did not want her exposed to the daily situations and incidents at the Ponce DO.

### I.  The September 1, 2017 incident with SA Philip Jones

84.    On September 1, 2017 SA Philip Jones entered Ms. Hernandez's office without knocking and she requested him to please knock the next time he arrived at her office.

85.    SA Jones wanted to clear his IMPREST Transactions because an unannounced audit was going to take place.

86.    Ms. Hernandez was in the middle of working an IMPREST Fund transaction and had another waiting for immediate attention.

87.    Ms. Hernandez asked SA Jones who was going to stay as the Alternate Cashier because he had mentioned he was going to be out of the office from September 16, 2017.  SA Jones simply insisted that an audit was going to take place and left.

88.    SA Jones returned and claimed he had been ordered by ASAC Joseph to proceed with the unannounced audit.

89.    Ms. Hernandez maintained that she needed to conclude the transaction before the audit could be conducted, and that ASAC Joseph was fully aware of it because he had just approved the form needed for the disbursement.

90.    SA Jones insisted that as per ASAC Joseph's instructions they were to immediately conduct the audit regardless of the ongoing transaction.

91.    Ms. Hernandez went to Group Supervisor Lawrence Christmas to inform him that she was in the middle of an IMPREST monetary transaction, that TFO Elliot Ramirez was waiting at the cashier window, and she needed to finish the transaction before the unannounced audit.

92.    GS Christmas insisted that ASAC Joseph wanted the audit NOW.

93.    When Ms. Hernandez returned to her office SA Jones, SA Lauren García and SA Juan Molina had commenced the audit of alternate cashier drawer.

94.    Ms. Hernandez asked Special Agents Garcia, Molina and Jones to allow her to finish the transaction with TFO Ramirez and that she needed to be present for the audit, even if it was the alternate cashier drawer.

95.    SA Jones immediately shouted and said, "The audit is going to take place regardless, the ASAC wants it done now, so we are going to continue".

96.    Ms. Hernandez asked not to be screamed at and insisted on finishing the IMPREST Transaction and be present during the audit. She requested a witness and asked for GS Christmas.

97.    When GS Christmas arrived SA Jones turned towards Ms. Hernandez and in an aggressive manner once again shouted at a higher level "I'm not screaming at you, do you want to hear what it sounds like when I scream at you?", while raising the volume and tone of his voice.

98.    Ms. Hernandez asked SA Jones if he was going to hit her and he responded by shouting at her: "Fuck you. Get the fuck out of my face!!!".

99.    SAs Garcia and Molina approached and grabbed SA Jones' arms away from Ms. Hernandez's direction.

100.    SAs Molina and Garcia informed SA Jones that they had finished the Alternate Cashier audit.

101.    Ms. Hernandez called her husband.

102.    GS Christmas asked Ms. Hernandez why she was calling her husband and in a mocking tone stated: "do you think they are going to steal the money?". Ms. Hernandez responded: "No, I just need a trustful witness".

15

103.    Then Ms. Hernandez and SAs Molina and Garcia continued with the Principal Cashier Audit.

104.    The principal cashier audit resulted in a $50.00 overage.

105.    The same day of the incident GS Christmas issued identical written memoranda to both SA Jones and Ms. Hernandez for behaving in an "unprofessional manner". These were considered disciplinary written warnings.

106.    That same day SA Jones and Ms. Hernandez responded by memoranda addressed to SAC Donahue and ASAC Joseph with their versions of the events.

107.    Ms. Hernandez asked to be immediately relieved from IMPREST fund collateral duties, after all, SA Lauren Garcia had been approved for IMPREST fund training since August 1, 2017. Ms. Hernandez was not relieved from IMPREST fund duty.

108.    Ms. Hernandez filed a complaint with the Puerto Rico Police Department for Disturbance of Peace against SA Philip Jones.

109.    Ms. Hernandez insisted on relocating from the Ponce DO as a medical reasonable accommodation, as requested on August 28, 2017, emphasizing the devastating effects the September 1st aggression had on her rapidly deteriorating health.

110.    And on September 12, 2017 Ms. Hernandez had her first contact with the DEA EEO counselor, as the genesis of the EEO formal administrative complaint that would be filed on December 8, 2017, *DEA-2017-1107.*

111.    The continued animosity from ASAC Joseph was evident when less than two weeks later, specifically on September 12th, 2017, he gave instructions to clear the IMPREST fund.

112.    ASAC Joseph arrived accompanied by SAs Garcia, Molina, Jones, Christmas and Rush Patel as witnesses, all agents with a documented history of hostility towards Ms. Hernandez.

113.    Ms. Hernandez had arranged for her own witness, TFO Cruz, but ASAC Joseph forbade TFO Cruz's presence as witness.

114.    Ms. Hernandez asked ASAC Joseph if he was going to choose her witnesses and he responded: "YES". ASAC Joseph mocked and ridiculed Ms. Hernandez by making facial expressions and hand movements suggesting that she was crazy.

115.    Ms. Hernandez demanded respect. ASAC Joseph answered: "Whatever", as he continued to mock and make derogative facial and hand movements towards Ms. Hernandez.

116.    ASAC Joseph insisted that it was unnecessary to count the money again. However, the recounting of the money revealed mistakes in the first count.

117.    Ms. Hernandez asked GS Christmas to be treated with respect and reminded him that he was an EEO counselor in the Army, that he knew this was illegal and that she could not continue to endure the hostile work environment.

118.    The next day, September 13, 2017, Ms. Hernandez received an email from SAC Donahue sending her TDY to San Juan for fifteen days commencing on September 15, 2017.

### J.  Return to work after Hurricane Maria and the revocation of DEA authorization for outside employment

119.    Ms. Hernandez was in an extended medical leave from September 14-29, 2017 because she was referred for partial psychiatric hospitalization and was taking medications not suitable to drive long-distances.

120.    Then Hurricane Maria arrived on September 20, 2017 and destroyed Puerto Rico.

121.    The temporary assignment to San Juan was thus paused.

122.    All DEA employees in Puerto Rico were expected to return to work after Hurricane Maria on October 11, 2017.

123.    Ms. Hernandez, however, was on medical disability from October 4 to October 13, 2017 for medical treatment at an out-patient partial psychiatric hospitalization. She had notified all medical certificates, as required by the LRM, including the indication that she could return to work on October 13, 2017.

124.    While on medical leave, Ms. Hernandez was informed that SAC Donahue was looking for her.

125.    On October 12, 2017 Ms. Hernandez drove to a highway searching for cellular signal to contact SAC Donahue.

126.    Ms. Hernandez then accessed her personal email account where she read an email that notified the revocation of her outside employment authorization as requested by SAC Donahue.

127.    The "outside employment" was Ms. Hernandez's personal home-based small business of baking and selling cakes. She had this authorization since 2012.

128.    SAC Donahue's request for rescission of Ms. Hernandez's outside employment authorization was made on August 29, 2017, the day after Plaintiff's most recent request for medical accommodation after a partial psychiatric hospitalization.

129.   The reason alleged by SAC Donahue for the revocation was that the outside activity was supposedly interfering with the proper and effective performance of her duties as ASAC-Sec, although there is absolutely no evidence to support this conclusion.

130.   Ms. Hernandez had been forced to use extended sick leave for the treatment and recurrent hospitalization of her medical conditions exacerbated by her unhealthy work environment.

131.   Ms. Hernandez was further instructed that she had to discuss the authorization for outside employment revocation with SAC Donahue.

132.   Thus Ms. Hernandez telephoned SAC Donahue who insisted on asking if she had an official phone. Plaintiff indicated she did not. They then agreed to personally meet at the San Juan office on October 18, 2017.

133.   During the telephone conversation SAC Donahue did not mention any problems with sick leave requests or medical certificates.

134.   And on October 17, 2017 SAC Donahue certified Ms. Hernandez's Time & Attendance for pay period 20: October 1, 2017 to October 14, 2017. Plaintiff's T&A for that period indicated that from October 1-10, 2017, both dates inclusive, all leave was charged as "Weather and Safety Leave", and October 11-14, 2017 to annual leave because Ms. Hernandez had no sick leave balance.

### K.  The Notice of Proposed Five-Day Suspension

135.   On October 18, 2017 Ms. Hernandez was tendered a printed copy of the authorization for outside employment revocation; she had received a digital copy at her personal email.

136.    Also, Acting SAC James Doby personally gave her a Notice of Proposed Five Day Suspension.

137.    The proposed suspension action charged Ms. Hernandez with Unprofessional/Disrespectful Conduct (3 specifications) and Failure to Follow Supervisory Instructions (5 specifications).

138.    The Unprofessional/Disrespectful charge referenced the September 1, 2017 incident with SA Jones and the Letter of Warning of that day.

139.    The Failure to Follow Supervisory Instructions referenced Ms. Hernandez's refusal to verbally communicate with ASAC Joseph and employees alleged wariness to approach Plaintiff "for fear of a complaint related to retaliation, harassment, assault and/or EEO complaints, "all of which are a consistent pattern of behavior".

140.    The specifications under each charge mirrored the allegations that the Special Agents lead by SA Jasmine Carter had included in their EEO informal complaint that Ms. Gant discussed with Ms. Hernandez during the month of July 2017. This became apparent later when the complaining Special Agents were interviewed as part of the OPR Investigation against Ms. Hernandez and all of them included in support of their sworn statements the same partial copy of the informal complaint.

141.    Then on October 26, 2017, upon learning of Ms. Hernandez's previous filing with the Puerto Rico Police Department of a criminal complaint for disturbance of peace against SA Jones, SAC Donahue punished Ms. Hernandez and her husband, SA Johnny Melendez, to a two-weeks TDY in San Juan starting on October 30, 2017.

142.    On October 30, 2017 Ms. Hernandez and her husband reported to the San Juan office.

143.    On October 30, 2017 Ms. Hernandez submitted her response to the notice of proposed five days suspension.

144.    And on October 30, 2017 ASAC Joseph approved Ms. Hernandez's T&A for pay period 21, October 15-28, 2017.

145.    On November 7, 2017 Ms. Hernandez was notified with the decision upholding the proposed five-day suspension.

146.    When Acting SAC Doby delivered to Ms. Hernandez the suspension decision, he instructed Plaintiff to inform ASAC Joseph on her leave status.

147.    Two days later, on November 9, 2017, ASAC Joseph approved Ms. Hernandez's T&A for pay period 22, October 29 to November 11, 2017 which included 24 hours charged to annual leave because the sick leave balance was negative.

### L.  Plaintiff's Emergency Psychiatric Hospitalizations And ASAC Joseph's November 20, 2017 Memorandum

148.    Ms. Hernandez was ordered by her treating physicians to an emergency medical and psychiatric hospitalization from November 13 to 27, 2017.

149.    Ms. Hernandez's psychiatric emergency that required hospitalization extended until January 2018.

150.    Ms. Hernandez's husband hand-delivered to ASAC Joseph the weekly medical certificates required by the LRM.

151.    On November 17, 2017 SAC Donahue and ASAC Joseph were interviewed by the EEO Counselor regarding the September 1, 2017 incident.

152.    SAC Donahue and ASAC Joseph also had prior knowledge that Ms. Hernandez had filed with the PRPD a criminal complaint against SA Jones for disturbance of peace.

153.    On November 20, 2017 ASAC Joseph received an email from Secretary Jeannette Belardo with certain administrative forms of Ms. Hernandez and her husband relative to the time-period immediately after Hurricane Maria.

154.    ASAC Joseph claimed that AO Gloria Torres came to his office to follow-up on those forms.

155.    At the time Ms. Hernandez was hospitalized and she had no contact with ASAC Joseph.

156.    ASAC Joseph authored a memorandum on November 20, 2017 addressed to SAC Donahue, *Violation of Directive issued to Ms. Casandra A. Hernandez by Caribbean Division, Special Agent in Charge, Matthew G. Donahue and Acting Special Agent in Charge James N. Doby.* This memorandum is used as the basis for both specifications of the Insubordination charge against Ms. Hernandez that resulted in her removal from Federal service.

157.    ASAC Joseph's November 20, 2017 memo referenced a "Firebird Microsoft Outlook e-mail" dated October 11, 2017 sent by SAC Donahue to Ms. Hernandez. The Firebird account is the official e-mail account.

158.    The October 11, 2017 e-mail directed Ms. Hernandez to communicate with ASAC Joseph in person or by phone of her "intentions of coming to work" or if she would continue to be under medical care.  These instructions differ from the LRM directives.

159.    On October 11, 2017 Ms. Hernandez was on medical leave and did not have access to her official e-mail account.

160.    And when Ms. Hernandez spoke with SAC Donahue on October 12th, he did not mention the October 11th email, nor any problems with sick leave, and later approved all of Ms. Hernandez's requested leave until October 17, 2017.

161.    The November 20th memo from ASAC Joseph also referenced the November 7th directives given by Acting SAC Doby to Ms. Hernandez to coordinate her leave with ASAC Joseph.

162.    ASAC Joseph claimed that "as of November 20, 2107 Ms. Hernandez ha[d] failed to contact [him] either verbally or in writing, with an update on her leave status".

163.    ASAC Joseph's claims are false.

164.    Ms. Hernandez had coordinated her leave and two days later, on November 9, 2017, ASAC Joseph had approved the pertinent T&A.

165.    And as of November 20, 2017, Ms. Hernandez's husband had already delivered the medical certificates for the ongoing emergency psychiatric hospitalization.

166.    Also, four days later, on November 24, 2017, ASAC Joseph certified Ms. Hernandez's T&A for the pay period that included her November emergency psychiatric hospitalization.

### M.  *"This MADNESS has to Stop"*

167.    These were the prevailing circumstances at the time new SAC Apolonio Collazo issued his December 4, 2017 referring memorandum wherein he indicates that he was "made aware" on December 1st of the Puerto Rico Police Department's summons to SA Jones in the Disturbance of Peace complaint by Ms. Hernandez.

168.    At the time SAC Collazo had been in the position for less than a month.

169.    SAC Collazo was "made aware" of the situation by ASAC Joseph's December 1, 2017 email to Israel Alicea, SAC Collazo, James Doby, Edwin Vázquez, Matthew Donahue and Matthew Germanowski, the Deciding Official in the Five-Day Suspension final decision notified on November 7, 2017.

170.    ASAC Joseph stated in his email the following: "Good Day To All – Today, Friday, December 1, 2017 SA Philip Jones was served at the Ponce TDS office building for the Disturbance of Peace case filed by Ms. Hernandez. Please see attached. **This MADNESS has to stop**."

171.    When asked under oath during the MSPB hearing to which "madness" he was referring to, ASAC Joseph testified that he was referring to Ms. Hernandez's EEO filings and the PRPD criminal complaint against SA Philip Jones.

172.    In his short email ASAC Joseph was setting the tone to discredit Ms. Hernandez's credibility before SAC Collazo, who was the newcomer and presumptively had no prior knowledge of Plaintiff's substantial EEO protected activity resulting from an existing and progressively hostile work environment created, continued and provoked by then-former SAC Donahue and ASAC Joseph himself.

173.    In his nonchalant email ASAC Joseph was also planting the impression that Ms. Hernandez's actions were capricious and unjustified refusals to follow instructions, specifically the instructions to submit herself to the physical presence of her harasser.

174.    And ASAC Joseph was laying the ground to effectively block Ms. Hernandez's criminal complaint against SA Jones and use it to justify the ultimate adverse action of dismissal from Federal service.

### N.  DEA's obstruction of the criminal complaint filed by Ms. Hernandez

175.   SAC Collazo stated in his referring Memorandum that the September 1, 2017 incident "was appropriately handled by Caribbean FD management as per DEA policies and procedures", to imply that Ms. Hernandez's filing of a criminal complaint with the PRPD was unnecessary and had ulterior motivations not related to the incident but as a "self-serving office disruption".

176.   As of December 4, 2017 – the date of the referring memo - SAC Collazo believed "based on 'our' sources within the PRPD" that "the summons [to SA Jones] was issued after the constant urging by Ms. Hernández to PRPD officials over an incident that occurred in the Ponce DO office on September 1, 2017", and "even though PRPD officials repeatedly advised her that there were no facts to support any criminal violations".

177.   The reality was different.

178.   The summons to SA Philip Jones was issued as part of the investigation conducted by PRPD Agent Gabriel Bonano.

179.   PRPD Agent Bonano indicated that Ms. Hernandez complained on September 1, 2017, the same day of the incident.

180.   Agent Bonano originally considered the situation to be administrative in nature but was ordered by his supervisor to investigate.

181.   Then hurricanes Irma and Maria passed and destroyed Puerto Rico.

182.   After some time had passed post-hurricanes, Agent Bonano continued his investigation and visited the DEA offices.

183.   During Agent Bonano's visit to the DEA an "Agent Johnson" informed him that "Mr. Matthew Donahue chief of the DEA for Latin America, said that since the

complained acts occurred in the facilities of the Federal Government with federal employees, including Complainant, they would exercise jurisdiction on the matter and had already reached a conclusion, without providing any more details".

184.    Agent Bonano then consulted the case with DA Camille Soto of the Ponce District Office for the Puerto Rico Department of Justice who gave him summonses to serve on various DEA agents for investigation.

185.    It was then when SA Jones was summoned.

186.    After several days Mr. Edwin O. Vázquez, Division Counsel, DEA, personally showed up at the Puerto Rico Police headquarters, to inform that the summoned agents could not appear that day because they were in training outside of Puerto Rico. This was false.

187.    Therefore, contrary to what SAC Collazo was led to believe as per his assertions on December 4, 2017, the summons to SA Jones was not issued at the "constant urging" of Ms. Hernandez, and PRPD officials did not advise Ms. Hernandez that there were no facts to support the case.

188.    On January 10, 2018 SA Philip Jones sent AUSA Alberto Lopez an email pursuing the filing of federal criminal charges against Ms. Hernandez for "imped[ing], intimidate[ing] and interfere[ing] with [SA Jones], SA Juan Molina, SA Lauren Garcia, and ASAC Dave Joseph while engag[ing] in performance of [their] official duties in violation of 18 USC 111", referring the September 1, 2017 incident during the unannounced audit.

189.    In his January 10, 2018 retelling of the September 1st events, SA Jones conveniently omitted that he had failed to defuse the situation by responding "in a

26

matching tone" and had in fact escalated the hostilities by screaming at Ms. Hernandez: "Get the fuck out of my face".

190.   The USAO-PR declined to intervene in SA Jones's request to file federal criminal charges against Ms. Hernandez and referred the situation to DoJ-OIG to be dealt as an administrative matter.

191.   Afterwards, during the month of January 2018, that is, after SAC Collazo's referring memorandum, Agent Bonano received a summons from DA Ileana Espada to appear at her offices in the Puerto Rico Department of Justice central offices in San Juan.

192.   During one of his appearances at PR-DoJ, specifically on January 27, 2018, Agent Bonano saw that SAs Lauren Garcia, Juan Molina and GS Christmas were there and had been interviewed by DA Espada.

193.   On January 28, 2018 DA Espada interviewed Ms. Hernandez.

194.   The final decision by the PR-DoJ was notified in writing by DA Olga B. Castellon Miranda, Chief Prosecutor for the Puerto Rico Department of Justice, on May 5, 2018 to Mr. Edwin O. Vazquez, Division Counsel, DEA: "After … careful evaluation of the case file it was determined that the required elements of the offense were not met and thus the case was declined for prosecution".

195.   There is no apparent reason for the intervention of the highest level of criminal prosecutors of the Puerto Rico Department of Justice in an otherwise simple run-of-the-mill investigation of a disturbance of peace incident.

196.   The reasonable inference is that DEA Management in Puerto Rico used their influences with the Puerto Rico Police Department and the PR-DoJ to obstruct, derail and eventually defeat Ms. Hernandez's criminal complaint.

### *N. Removal from Federal Service*

197.    The investigation by the Office of Professional Responsibility (OPR) of the DEA based on SAC Collazo's referring Memorandum commenced on January 7, 2018.

198.    The pretext was to investigate the allegations of SAC Collazo's December 4, 2017 referring memorandum, repeating ASAC Joseph's "This MADNESS has to STOP" demand.

199.    The real purpose of the investigation was to obstruct the criminal complaint filed by Ms. Hernandez against SA Jones, which was "declined" for prosecution five months later, on May 5, 2018.

200.    The OPR Inspectors sought to portray Ms. Hernandez as the single culprit of the September 1st incident, because if she was the aggressor then the disturbance of peace charges could not be filed, as a matter of law.

201.    For that reason, OPR Inspector Escobar conscientiously pursued the route of seeking opinions from the witnesses to substantiate the labeling of Ms. Hernandez as the aggressor and the provoker.

202.    These opinions were not based on facts but on the feelings and personal beliefs of the witnesses, incorporating their personal biases and hostilities.

203.    Prejudiced leading questions were posed by the OPR Inspectors to SA Jones, SA Molina and SA Garcia, all of whom had a prior history of hostilities with Ms. Hernandez and had personal motives to deflect blame unto her; the January 19, 2018 questioning of ASAC Joseph by Inspector Escobar was obscenely leading.

204.    Ms. Hernandez did not omit or conceal any information in her interviews by the OPR Inspectors.

205.   The Final Report of Investigation is dated October 22, 2018.

206.   Eight months later, on June 25, 2019, Chairman Ludowig issued a memo to OPR requesting additional documents relating to the still pending investigation.

207.   The specific documents requested were the November 20, 2017 memo by ASAC Joseph, and the October 11, 2017 email from SAC Donahue to Ms. Hernandez.

208.   The November 20th email was obtained, but the October 11th email was not located or produced.

209.   On September 3, 2019, a year and nine months after the investigation commenced, Chairman Ludowig requested another supplemental investigation. On this occasion the request was for a supplemental sworn interview of ASAC Joseph and Ms. Hernandez.

210.   The reason for the supplemental interviews was to obtain specific instances of insubordination that occurred within a valid timeframe after the Five-Day suspension of November 2017 and that was not the subject of another Eight-Day suspension issued on July 24, 2018.

211.   On June 26, 2018 Ms. Hernandez was notified with a proposed suspension on the charges of unauthorized employment, and failure to follow written or oral instructions. This investigation was initiated on January 3, 2018 based on a December 28, 2017 referring memorandum from Acting SAC Doby reporting certain conduct that allegedly occurred from October 12, 2017 to January 28, 2018. Acting SAC Doby indicated that Ms. Hernandez had engaged in outside employment after her authorization had been revoked, by selling $25 worth of cakes, and had failed to notify her supervisor of the authorization revocation. The decision dated July 24, 2018 was that the charges

were supported but the proposed penalty too harsh, thus it was mitigated to an eight-day suspension.

212.    Chairman Ludowig thus sought to extricate the incidents of the July 24, 2018 suspension from the investigation of SAC Collazo's referring memorandum.

213.    Chairman Ludowig sought from ASAC Joseph specific details surrounding the specific instances of insubordination, including dates and documents.

214.    And, also sought details regarding Ms. Hernandez's admission of refusing to communicate with ASAC Joseph within the context of the specific instances sought from Joseph.

215.    ASAC Joseph was interviewed again on October 25, 2019, however he could not provide any specific instances besides those discussed in the November 20th, 2017 memo.

216.    Ms. Hernandez was not interviewed as requested by Chairman Ludowig.

217.    On May 6, 2020, almost two and a half years after the investigation had commenced, Ms. Hernandez received the notice of proposed action for removal from Federal service based on the charges of Insubordination and Lack of Candor, signed by Kenneth M. Ludowig, Chairman of the Board of Professional Conduct.

218.    The insubordination charge is based on two separate incidents included in ASAC Joseph's November 20, 2017 memorandum.

219.    The first incident of insubordination supposedly occurred when Ms. Hernandez was allegedly ordered by SAC Donahue on October 11, 2017 to provide the doctor's orders of why she could not show up for work that week, and by Acting SAC Doby on November 7, 2017 to provide her leave information. ASAC Joseph insisted that

despite the directives "as of November 20, 2017 [Hernandez] had failed to contact [him], either verbally or in writing, with an update on her leave status".

220.    The second incident of insubordination was also constructed on ASAC Joseph's November 20, 2017 email. ASAC Joseph complained that Ms. Hernandez had evaded verbal communication with him and had instead sent message with a coworker. The notice of proposed action concluded that Ms. Hernandez admitted to insubordination by accepting that despite SAC Donahue's instructions she had failed to verbally communicate with ASAC Joseph: "I did follow the rules via e-mails and texts. I did not do it physically because I wanted to avoid problems…".

221.    This admission by Ms. Hernandez was generic in nature and lacked referential details, as per Chairman Ludowig's own assessment that motivated the September 2019 request for a supplemental investigation. Also, the October 11th email from SAC Donahue was not part of the record and was never shown to Ms. Hernandez.

222.    And, considering the prevailing situation of the constantly intensifying hostile work environment resulting from denounced discrimination, EEO protected activity and unlawful retaliation, SAC Donahue's order was unreasonable, its crass impertinence suggesting at least a reckless disregard for Plaintiff's EEO rights, and unlawful. It is a basic tenet of anti-discrimination and anti-retaliation laws that it is illegal to force an employee to work in a hostile environment. In this appropriate context, SAC Donahue's insistence, and ASAC Joseph's reiterated demand to have Ms. Hernandez personally and verbally communicate with him, were provoking insubordination and pursuing retaliation.

223.    The Lack of Candor charge is based on the OPR Inspectors' subjective interpretation of Ms. Hernandez's sworn testimony.

224.    On July 10, 2020 Ms. Hernandez submitted to Matthew J. Germanowski, Deciding Official, a timely response to the proposed removal.

225.    On August 4, 2020 Ms. Hernandez submitted a supplemental response.

226.    DO Germanowski decided to uphold both charges and the proposed penalty of removal from Federal service.

227.    The decision letter was noticed to Ms. Hernandez on August 7, 2020 and removal from Federal service was effective that same day.

228.    When the decision letter was notified, Ms. Hernandez had not been under ASAC Joseph's direct supervision since her emergency psychiatric hospitalization of November 2017, which he had certified as approved leave on November 24, 2017.

229.    Ms. Hernandez's sick leave extended from November 13, 2017 until her return to work on or about January 3, 2018.

230.    Ms. Hernandez had returned to work in January 2018. She was initially detailed to work in San Juan, then to Telework, followed by relocation to another area in the Ponce DO.

231.    Ms. Hernandez retained her ASAC-Sec position and received excellent evaluations for her work.

232.    Besides the 8-day suspension of July 2018, which is a remnant of the SAC Donahue - ASAC Joseph retaliation plan, Ms. Hernandez did not have any disciplinary issues.

### O. The MSPB Appeal

233.    On September 20, 2020 Ms. Hernandez timely filed with the MSPB an appeal challenging her removal from Federal service.

234.    Ms. Hernandez affirmatively alleged that favoritism and discriminatory retaliation consequent to EEO protected activity were the but-for factors in the decision to remove her from Federal service.

235.    Ms. Hernandez also alleged that the Agency's action of removing her from Federal service would not have been taken but for her "otherwise protected activity" that included EEO protected activity and the filing of a disturbance of peace criminal complaint against SA Philip Jones, which was, in turn, part of her EEO protected activity and independently a prohibited personnel practice under the purview of 5 U.S.C. 2302(b)(9)(A)(ii).

236.    The Appeal was assigned to Administrative Judge Nicole DeCrescenzo.

237.    Prior to the hearings held on December 10 and 16, 2020, AJ DeCrescenzo disallowed the claim of the disturbance of peace criminal complaint against SA Jones as a protected activity, holding without explanation, that said action was not contemplated by the law to be a "prohibited personnel practice".

238.    On December 23, 2020 AJ DeCrescenzo issued an Initial Decision finding that the Agency had proven the Insubordination charge, not the Lack of Candor charge, but that removal was still not unreasonable punishment. And, that there was less than preponderant evidence to support a finding that the Agency was motivated by retaliation for Ms. Hernandez's EEO activity.

239.    Therefore, the Agency's action of removal was affirmed.

240.    The decision became final on January 27, 2027 as per the "Notice to Appellant".

## V.    CAUSES OF ACTION

### A.  Retaliation for EEO Protected Activity

228. The allegations of all preceding paragraphs and subsequent paragraphs are restated and incorporated by reference as if they had been set forth fully herein.

229.    The actions described herein constitute retaliation for prior EEO protected conduct, which includes the repeated requests for medical-reasonable accommodation, the filing of various administrative complaints with the DEA's EEO denouncing discrimination and reprisals, the filing of complaints with the DoJ-OIG, and the filing of a judicial complaint with this court.

230.    The ultimate act of retaliation is Plaintiff's removal from Federal service.

231.    The denounced actions caused Plaintiff emotional and physical damages, including a psychiatric condition that required recurrent hospitalization.

232.    Plaintiff has suffered to date a loss of income, in addition to a loss of employment benefits.

233.    This claim is brought pursuant to Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* and the Civil Rights Act of 1991, as amended, 42 U.S.C. 1981, for relief from retaliation for engaging in EEO protected activity.

234.    Defendant is liable under Title VII as Plaintiff's employer.

### B.  Violation of the Civil Service Reform Act of 1978 (removal from Federal service)

235.    The allegations of all preceding paragraphs and subsequent paragraphs are restated and incorporated by reference as if they had been set forth fully herein.

236.    Plaintiff Casandra Ann Hernandez contests her removal from Federal service and seeks this Court's review of the decision of the MSPB in accordance with 5 U.S.C. 7703(b)(2) and the *Perry v. MSPB*, 582 U.S. ____ (2017) holding.

237.    The charge of Insubordination is based on false allegations, unsupported and contradicted by the documentary evidence.

238.    Furthermore, the Insubordination charge is motivated by a discriminatory retaliatory *animus*. Ms. Hernandez's refusal to verbally communicate with ASAC Joseph does not rise to the level of insubordination, because it was not a willful and intentional refusal to obey an authorized order considering the prevailing situation of the constantly intensifying hostile work environment. Rather, SAC Donahue's order was unreasonable, impertinent and unlawful.

239.    The charge of Lack of Candor is based on an erroneous interpretation of the legal definition of the offense and is not sustained by the evidence.

240.    Furthermore, the interpretation of Ms. Hernandez's testimony, used as the basis for the Lack of Candor charge, is prejudiced by discriminatory retaliatory *animus*.

241.    And the penalty of removal for the proven offenses is too harsh.

## PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff Casandra Ann Hernandez respectfully requests this court,

a.  Determine that the actions of DEA management were discriminatory, retaliatory and otherwise in violation of Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. 2000e, *et seq.* and the Civil Rights Act of 1991, as amended, 42 U.S.C. 1981, for relief from retaliation for engaging in EEO protected activity, and other applicable laws and regulations prohibiting discrimination against federal employees.

b.  Determine that her removal from Federal service violates the Civil Service Reform Act of 1978 (CSRA), as amended, 5 U.S.C. 1101, *et seq,* 5 U.S.C. 7703(b)(2) and *Perry v. MSPB*, 582 U.S. _____ (2017).

c.  Provide for compensatory damages of no less than $300,000.00.

d.  Provide for back pay and for the loss of other benefits expected to increase in the future.

e.  Order the Government to pay reasonable attorney's fees, costs, litigation expenses and prejudgment and post-judgment interest.

f.  Order reinstatement to her Federal service position.

g.  Order reinstatement of all leave used consequent to the discriminatory retaliation.

h.  Order the expungement of all discriminatory disciplinary actions from the official personnel file.

(…continues in next page…)

i.   Order all other relief the court deems adequate and just.

j.   Order that this case be heard by a Jury.

k.   Enter judgment on behalf of Plaintiff and against the Defendant.

This 26th day of February, 2021.

**LOPEZ TORO**
**Estudio de Derecho & Notaría**
PO Box 635
Rio Grande, Puerto Rico 00745
Tel. 787-957-2640; Mobile 787-646-6395
ESTUDIOLOPEZTORO@aol.com

*s/Bámily López Ortiz*
**Bámily López Ortiz**
USDC-PR 205410

*S/Lizabel M. Negrón-Vargas*
**Lizabel M. Negrón-Vargas, Esq**.
USDC-PR 209803
Tel: 787-392-0450 Fax: 787-281-0708
PO Box 360764
San Juan, PR 00936-0764
lizanegron@yahoo.com